**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-286 (BAH) |
| GRADY DOUGLAS OWENS, | Chief Judge Beryl A. Howell |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Defendant Grady Douglas Owens, a 21-year-old college student from Blanco, Texas, was part of the angry mob that, on January 6, 2021, stormed restricted areas on the U.S. Capitol grounds and attacked the U.S. Capitol building itself. As defendant concedes, the mob's riotous actions "resulted in deaths, injuries, destruction and the gravest threat to our Republic since the Civil War." Def.'s Suppl. to Def.'s Mot. for Revocation of Det. Order Pursuant to 18 U.S.C. § 3145(b) ("Def.'s Suppl. Mem."), at 1, ECF No. 23. As a group of District of Columbia Metropolitan Police Department ("MPD") officers responded to assist U.S. Capitol Police ("USCP") officers in protecting the U.S. Capitol building against the mob seeking to disrupt the certification of the electoral college results for the 2020 Presidential Election, videoclips show defendant swinging a skateboard at one MPD officer, yelling and making obscene gestures at MPD officers, and trying unsuccessfully to push past a police line to breach the Capitol building itself.

Based on his alleged conduct on January 6, 2021, defendant is charged in a six-count indictment with four felony and two misdemeanor offenses, including (1) Obstructing, Impeding, or Interfering with a Law Enforcement Officer Lawfully Engaged in the Performance of His Official Duties, Incident to the Commission of a Civil Disorder that Adversely Affects the

Performance of Any Federally Protected Function, in violation of 18 U.S.C. § 231(a)(3); (2) Forcibly Assaulting, Resisting, Opposing, Impeding, Intimidating or Interfering with an Officer of the United States, While Such Officer or Employee was Engaged in or on Account of the Performance of Official Duties, While Using a Dangerous Weapon or Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1) and (b); (3) Knowingly, and With Intent to Impede or Corrupt Orderly Conduct of Government Business or Official Functions, Engaging in Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) and (B); and (4) Knowingly Engaging in Physical Violence Against Any Person or Property in a Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) and (B).  Indictment at 2–4, ECF No. 5.[1]

Following his arrest in Florida, where he was enrolled in college, defendant was ordered detained pending trial, on April 2, 2021, by a magistrate judge on the District Court for the Middle District of Florida.  Det. Order, *United States v. Owens*, Case No. 21-mj-1286-DCI (Apr. 2, 2021), ECF No. 13.  Defendant now moves for revocation of the magistrate judge's order and for pretrial release to the third-party custody of a pastor and music leader at defendant's church in Spring Branch, Texas, subject to home detention and location monitoring, with courtesy supervision by Pretrial Services in the Western District of Texas (Austin Division). Def.'s Mot. for Revocation of Det. Order Pursuant to 18 U.S.C. § 3145(b) ("Def.'s Mot.") at 1, ECF No. 13.

For the hearing held in this Court on May 10, 2021, the government submitted four videoclips not made available at the original detention hearing, two of which videoclips—along with medical records of the MPD officer, whom defendant struck with his skateboard, and

---

[1]     Defendant is also charged with two misdemeanor offenses of Obstructing, or Impeding Passage Through or Within, the Ground of any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E), and Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *Id.* at 3–4.

reports by the Federal Bureau of Investigation of interviews with another MPD officer and a USCP officer at the Capitol building ("FBI 302s") submitted by defendant—had been produced after completion of briefing on defendant's motion. The parties' request for an opportunity for supplemental briefing regarding the additional post-briefing evidence was granted, and defendant's motion for revocation of the detention order became ripe for resolution on May 19, 2021.

For the reasons explained below, defendant's motion is granted, and defendant will be released pending trial, subject to stringent conditions of home detention.

## I.      BACKGROUND

The government's proffer in support of pretrial detention, as well as the evidence submitted by defendant, are described below, followed by a brief review of the procedural history.

### A.      Defendant's Conduct on January 6, 2021

Defendant traveled to Washington, D.C. with his father, Jason Douglas Owens, on January 5, 2021.  Crim. Compl., Statement of Facts ("SOF") at 7, ECF No. 1-1.[2]  The two men reported to family friends that the purpose of their trip to the nation's Capitol, accompanied by defendants' grandparents, was "to pray for this nation, for the leaders, for peace and unity." Def.'s Mot., Attach. 3 at 19, ECF No. 13-3 (letter from Mary and J. Ken Dockery, dated April 20, 2021); *see also id.*, Attach. 2 at 6, ECF No. 13-2 (letter from Jim and Nancy Owens, dated April 22, 2021, stating defendant intended to "pray for our country on the [C]apitol steps").[3]

---

[2]      Jason Douglas Owens is charged in a separate case by criminal complaint and was released pretrial on personal recognizance by Magistrate Judge Harvey in the District of Columbia on April 21, 2021.  *See* Compl., *United States v. Jason Douglas Owens*, Case No. 21-mj-376 (RMM) (D.D.C. Apr. 15, 2021), ECF No. 1; Order, *United States v. Jason Douglas Owens*, Case No. 21-mj-376 (RMM) (D.D.C. Apr. 21, 2021), ECF No. 7.
[3]      Defendant has submitted 34 letters from defendant's family and friends that are referenced by the pagination assigned by the Court's Case Management/Electronic Case Files (CM/ECF) system.  *See* Def.'s Mot.,

The evidence proffered by the government shows that defendant's conduct on January 6, 2021, was far different than the story of peaceful prayer promoted to family and friends.

That day, permanent and temporary security barriers were in place to bar the public from the restricted grounds of the U.S. Capitol and West Front Inaugural Platform. SOF at 1. These barriers included "bike racks that were positioned to the north of the U.S. Capitol along Constitution Avenue; to the south of the U.S. Capitol alone Independence Avenue; to the west of the U.S. Capitol, between the Capitol Plaza (East Front) and the grassy areas located between the Plaza and First Street." *Id.* In addition, due to preparations and ongoing construction for the presidential inauguration, the area around the West Front Inaugural Platform had added temporary barriers, including green snow fencing and signage stating: "Area Closed By order of the United States Capitol Police Board." *Id.*

By approximately 2:00 p.m. on January 6, 2021, individuals in a large crowd gathered on the Capitol grounds had forced their way "through, up and over temporary and permanent barricades," to advance to the exterior façade of the U.S. Capitol building and force entry into the Capitol building. Govt's' Resp. to Def.'s Mot. for Revocation of Det. Order Pursuant to 18 U.S.C. § 3145(b) ("Gov't's Opp'n") at 3, ECF No. 14. As the Capitol was being breached, USCP requested assistance from MPD. *Id.* at 4. At approximately 1:53 p.m., a group of approximately 33 MPD officers responded to the USCP request for assistance and made their way through the West lawn of the Capitol grounds on their way to the lower west terrace tunnel area of the Capitol. *Id.*; SOF at 1. Body-worn camera ("BWC") footage recorded by MPD Officers P.K. and C.B., in addition to screenshots from this footage, show the group of MPD

Attach. 1, ECF No. 13-1; *id.*, Attach. 2; *id.*, Attach. 3, ECF No. 13-3; Def.'s Reply Supp. Def.'s Mot. for Revocation of Det. Order ("Def.'s Reply"), Attach. 1, ECF No. 15-1; Def.'s Suppl. Mem., Attach. 4, ECF No. 23-4.

officers, clad head-to-toe in riot gear and identifiable from the back by the words "Metropolitan Police" emblazoned in large white letters on their uniforms and "MPDC" printed on their helmets, walking through "several unknown subjects who were positioned on the West lawn of the U.S. Capitol Building."  *Id.*; Gov't's Opp'n, Ex. 2, MPD Officer P.K. BWC Footage ("P.K. BWC Footage"); Def.'s Reply, Ex. A, MPD Officer C.B. BWC Footage ("C.B. BWC Footage"); *see* Gov't's Not. Filing of Exs. Pursuant to Local Crim. Rule 49 ("Gov't's Not.") at 1, ECF No. 24.  Defendant was among the "unknown subjects" on the West lawn within the breached perimeter of restricted Capitol grounds.

As the MPD officers approached the Capitol building, they were surrounded by a milling, agitated crowd screaming at and berating the officers variously for being "traitors," "storm troopers," "pigs," "oath breakers" and "assholes."  P.K. BWC Footage at 13:58:38–13:59:56; C.B. BWC Footage at 13:58:49-13:59:56.  At one point, Officer C.B. pushed an unknown individual out of the way and towards defendant's back and then grabbed defendant's forearm. C.B. BWC Footage at 13:59:59–14:00:00.  Defendant quickly turned to the left, raised the skateboard in his hands above his head and swung the skateboard forcefully down toward Officer C.B.'s head.  P.K. BWC Footage at 13:59:59–14:00:01; C.B. BWC Footage at 13:59:59– 14:00:01; Gov't's Opp'n at 5–6.  Though no sound of an impact from the skateboard can be heard on the submitted BWC footage, Officer C.B. points to defendant stating "APO," meaning "assault on police officer."  Def.'s Suppl., Ex. C, FBI 302 Interview of Officer C.B. (Jan. 19, 2021) at 1, ECF No. 23-3.

Following Officer C.B. being struck with the skateboard, a brief physical altercation ensued between MPD officers, defendant and other people in the crowd.  P.K. BWC Footage at 13:59:59–14:00:40.  During the scuffle, defendant is not visible in the BWC footage of either

Officer C.B. or Officer P.K, although the curved edge of defendant's skateboard appears briefly over the shoulder of an MPD officer, *id.* at 14:00:11.  After this altercation, MPD officers formed a protective line facing the mob.  *Id.* at 14:00:55; Gov't's Opp'n at 6.  The government proffers that "[w]hile the officers attempt to get their bearings, the defendant does not back away or exhibit any remorse or concern for his behavior—instead, he continues to yell at officers including among other indiscernible statements, 'How do you live with yourselves!?'" and "points at the officers menacingly and makes obscene gestures."  Gov't's Opp'n at 6 (citing and accurately describing P.K. BWC Footage at 14:01:00–14:01:11).  As noted, this BWC footage was described as part of the government's proffer but not shown at defendant's initial detention hearing on April 2, 2021, before the magistrate judge in the Middle District of Florida.

After the initial round of briefing was completed on defendant's pending motion, and shortly prior to the hearing, the government submitted two additional videoclips that had been recently uncovered as part of the government's continuing investigation.  Gov't's Suppl. Brief Related to Def.'s Mot. Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b) ("Gov't's Suppl.") at 2, ECF No. 20.  These videos from Capitol building internal security cameras show defendant at the entrance to the "East Rotunda (Columbus) Doors" with his father at around 3:25 p.m., about an hour and a half after defendant's altercation with MPD officers on the West lawn of the Capitol grounds.  Gov't's Ex. 3, U.S. Capitol Surveillance Video (3:25 p.m.–3:28 p.m.) ("Capitol Videoclip No. 1"); Gov't's Ex. 4, U.S. Capitol Surveillance Video (3:28 p.m.–3:30 p.m.) ("Capitol Videoclip No. 2"); *see* Gov't's Suppl. at 3; Gov't's Not. at 1.  Defendant and his father are first seen at the rear of a large mob that had breached the entrance to the Capitol building and continued to push energetically through the doors, as a line of USCP officers inside tried to block entry.  Gov't's Suppl. at 4; Capitol Videoclip No. 1 at 0:17–2:20.  As the many

officers try to push the rioters back through the double doors at the entryway and out of the building, *id.*, defendant's father points through the doors into the building repeatedly, signaling the direction he and defendant are trying to head.  *Id.* at 0:57–1:01; 2:16–2:18.  Defendant stands behind his father, carrying the same skateboard and blue Trump 2020 flag he carried during his altercation with law enforcement ninety minutes prior.  *Id.* at 0:57–2:56.

Reinforcements for the USCP officers arrived to help expel the rioters from the building, but defendant and his father continue to stand with other rioters blocking the doorway and preventing law enforcement officers from pushing the mob outside.  *Id.* at 2:28–2:56; Capitol Videoclip No. 2 at 0:00–0:33.  Defendant even leans into his father's back, providing additional resistance against the officers trying to push the rioters outside the building.  Capitol Videoclip No. 1 at 2:30–2:56; Capitol Videoclip No. 2 at 0:00–0:22.

Before defendant and his father were able to gain full entry into the Capitol building, a gaseous substance was discharged near the doorway, causing numerous rioters, including defendant, to retreat from the doorway into the open air outside.  Capitol Videoclip No. 2 at 0:15–0:30.  Defendant and his father then are outside the camera frame, *id.* at 0:32–1:01, until defendant's father can be observed again, shortly before USCP and MPD police officers are able to reach the doors to close them, *id.* at 1:01–1:37.  Before the officers are able to close the doors, however, defendant's father props himself against the open door and shoves an officer trying to close the door.  *Id.* at 1:37–1:42.  An MPD officer responds by pushing defendant's father away from the doors to close it, but defendant's father quickly reopens the door, prompting multiple officers to spill out of the doorway to push rioters, including defendant's father, away from the building.  *Id.* at 1:44–1:48.  The government proffers that, amidst this strenuous effort of USCP and MPD officers to expel and control the rioters, defendant "once again raise[d] his skateboard

7

and [swung] it hard at an officer."  Gov't's Suppl. at 4–6 (citing Capitol Videoclip No. 2 at 1:50–

1:55).  In a subsequent interview, the MPD officer shown on this videoclip, though recalling

"seeing someone on January 6, 2021[] with a skateboard in their hands," denies being "hit by a

skateboard."  Def.'s Suppl., Ex. A, FBI 302 Interview of MPD Officer H.S. (May 17 & 18, 2021)

at 1–2, ECF No. 23-1.

### B.    Officer Injuries

The government's Statement of Facts supporting the criminal complaint against

defendant stated that Officer C.B. "sustained a concussion and injury to the right pinky finger" as

a result of his service on January 6, 2021.  SOF at 3.  Yet, the medical records the government

has expeditiously produced in discovery do not reflect a firm medical diagnosis of concussion for

this officer.  On January 7, 2021, Officer C.B. recounted, in an official injury report, that he

received "multiple injuries" while "trying to stop a riot at the [U.S. Capitol]," including being

"struck [in the head] by bricks, baseball bats and other hard objects," and having his "right pinky

finger . . . smashed and hit many times."  Medical Records at 16, ECF No. 19-1.  In addition,

Officer C.B. reported "blunt force trauma to [his] head, back, hand, and jaw."  *Id.*; *see also id.* at

14.  As a result of this report, Officer C.B. was clinically assessed on January 7, 2021 and

diagnosed with a "crushing injury of [the] right little finger" and "[multiple] contusions."  *Id.* at

15; *see id.* at 6–8.  In a subsequent January 12, 2021 assessment, the clinician reported Officer

C.B. had a "possible concussion" but also noted that Officer C.B. "denie[d] any concussion

related [symptoms]."  *Id.* at 3.  In a final February 9, 2021 assessment, Officer C.B. "denie[d]

any cognitive residual" from his initial contusions.  *Id.* at 1.

### C.    Identification and Arrest of Defendant

In the aftermath of the January 6 attack on the Capitol, defendant, initially unknown to

the government, was pictured on an FBI Wanted Poster in the red jacket and black and white

checkered shirt he was wearing during the assault on the Capitol.  SOF at 4.  The government

subsequently uncovered additional, higher-quality images of defendant on the Twitter profile of

@SeditionHunters, which is operated by a private citizen who actively assisted federal law

enforcement in identifying subjects listed on FBI Wanted Posters in connection with the events

of January 6.  *Id*. at 5.  Using one of these higher-quality images, the government conducted an

open-source search for similar images of defendant and located an Instagram profile belonging to

user @grady_owens_.  *Id.* at 5.  Using the name "Grady Owens," the government was able to

identify a vehicle associated with defendant at a Florida apartment complex and Full Sail

University.  *Id.* at 5.  Armed with this information, the government approached the apartment

complex's property manager and two employees at Full Sail University and confirmed

defendant's identity.  *Id.* at 6.

On April 1, 2021, federal law enforcement officers arrested defendant in Winter Park,

Florida on a March 30, 2021 criminal complaint warrant.  *See* Crim. Compl., ECF No. 1; Arrest

Warrant Return (Apr. 1, 2021), ECF No. 8.  At the time of defendant's arrest, law enforcement

executed a search warrant of defendant's apartment and recovered a red jacket consistent with

the jacket defendant was seen wearing on January 6.  Gov't's Opp'n at 11.  Law enforcement

additionally recovered a black and white checkered shirt from defendant's parents' home in

Blanco, Texas also consistent with the defendant's January 6 outfit.  *Id.*

### D.     Procedural History

Defendant was arrested on April 1, 2021 in Florida and a detention hearing was held the

next day before a magistrate judge in the Middle District of Florida. Not. of Hearing, *United*

*States v. Owens*, Case No. 21-mj-1286-DCI (Apr. 2, 2021), ECF No. 7.  At the hearing, the

magistrate judge granted the government's motion for detention pending trial, *see* Gov't's

Opp'n, Ex. 1, Magistrate Judge Irick Hr'g Tr. ("Fla. MJ Hr'g Tr.") at 11:4–11:7, ECF No. 14-1,

upon finding that "no condition or combination of conditions of release [would] reasonably assure the safety of any other person or the community, Order, *United States v. Owens*, Case No. 21-mj-1286-DCI (Apr. 2, 2021), ECF No. 13.  On April 7, 2021, defendant was indicted in the District of Columbia and, on April 16, 2021, defendant was arraigned in this Court.  Indictment; Min. Entry (Apr. 16, 2021).  On April 23, 2021, defendant filed the instant motion to revoke the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b).  *See* Def.'s Mot. at 1.  A hearing on defendant's motion was held on May 10, 2021, with defendant participating remotely from the Middle District of Florida.  *See* Min. Entry (May 10, 2021).  Following submission of supplemental briefing requested by the parties, defendant's motion is now ripe for resolution.

## II.     LEGAL STANDARD

The Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, authorizes a defendant ordered detained pending trial by a magistrate judge, pursuant to 18 U.S.C. § 3142, to "file, with the court having original jurisdiction over the offense, a motion for revocation of the [detention] order or amendment of the order," which motion must be resolved "promptly."  18 U.S.C. § 3145(b).  This statute does not specify the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the D.C. Circuit "ha[s] not squarely decided the issue."  *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).  Nonetheless, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*.  *See United States v. Chrestman*, Case No. 21-mj-218 (ZMF), 2021 U.S. Dist. LEXIS 36117 at *14–18, *14 n.5 (D.D.C. Feb. 26, 2021) (collecting cases and detailing analysis).  Moreover, when the district court makes findings that are not "based on the same record as was before the Magistrate Judge[,]… the situation [is] more

akin to a new hearing and as such, the issue before the District Court [is] not really whether to defer (or not) to a finding made by the Magistrate Judge on the same evidentiary record." *Munchel*, 991 F.3d at 1280.  Particularly in this circumstance, the D.C. Circuit panel in *Munchel* suggested, again without resolving, *id.*, that a reviewing district court confronted with a supplemental record not before the magistrate judge undertakes the analysis required by the BRA, without deference to the magistrate judge's findings.

The BRA provides that a judicial officer "shall order" the "pretrial release of" a defendant, 18 U.S.C. § 3142(b), (c), unless, after a detention hearing, and upon consideration of "the available information concerning" enumerated factors, *id.* § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," in which case the judicial officer "shall" order pretrial detention, *id.* § 3142(e)(1).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention.  *United States v. Salerno*, 481 U.S. 739, 754–55 (1987).  In making this assessment, the following four factors must be "take[n] into account": (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam). Detention must "be supported by 'clear and convincing evidence' when the justification is the safety of the community."  *Munchel*, 991 F.3d at 1279–80; *see also United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  For pretrial detention based on dangerousness, the government must thus "prove[] by clear and convincing evidence that an arrestee *presents an identified and articulable threat* to an individual or the community . . . ."  *Munchel*, 991 F.3d at 1280 (emphasis in original) (quoting *Salerno*, 481 U.S. at 751); *see also id*. at 1283 ("Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community.").  Such "threat must also be considered in context," and "depends on the nature of the threat identified and the resources and capabilities of the defendant."  *Id*.

In the particular context of the January 6, 2021 attack on the Capitol, the *Munchel* panel acknowledged that "[i]t cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community."  *Id.* at 1284–85.  Nonetheless, where the specific threat posed by defendants was to "the peaceful transfer of power," *id*. at 1284, and "the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community," *id*., the district court must consider and explain how defendants "would be capable of doing so now that the specific circumstances of January 6 have passed," *id*.  Put simply, under the specific guidance of *Munchel*, a defendant merely posing a danger to others and the community on

January 6, 2021 is insufficient to "warrant this exceptional treatment" of pretrial detention. *Id*. at

1285.  Instead, dangerousness must be predicated on a finding that a defendant "in fact pose[s] a

threat of committing violence in the future." *Id*. at 1284.[4]

## III.   DISCUSSION

Defendant contends that his pretrial detention should be revoked because the government

has not shown that defendant is dangerous, Def.'s Mot. at 4, much less that defendant presents an

"ongoing '*articulable threat* to an individual or the community.'"  Def.'s Mot. at 3 (emphasis in

original) (quoting *Munchel*, 991 F.3d at 1280 (quoting *Salerno*, 481 U.S. at 751)).  In

considering the requisite § 3142(g) factors, the Court concludes that the government has not met

its burden of demonstrating, by clear and convincing evidence, that "no condition or combination

of conditions will reasonably assure" the safety of the community, 18 U.S.C. § 3142(e)(1), and

therefore orders that the defendant be released, subject to a combination of conditions to ensure

he poses no danger to any other person or to the community.  The requisite statutory factors are

discussed *seriatim*.

---

[4]      The *Munchel* panel concluded that a dangerousness finding was insufficiently explained by the district court, warranting remand for further consideration of the pretrial detention order, *Munchel*, 991 F.3d at 1275, 1282, 1284, despite the fact that, *inter alia*: (1) defendants engaged in planning for and were prepared for the riot on January 6, 2021, as reflected by their wearing tactical vests and carrying a backpack with "weapons," *id*. at 1276, which they "stowed" outside the Capitol building when they entered the building, *id*.; (2) one defendant wore a taser that he brought with him to this district, "holstered on his hip" inside the Capitol building, *id*.; (3) defendants accompanied the crowd inside the Capitol building to help "shut down" Congress, despite knowing tear gas had been used to keep them out, *id*.; (4) defendants cheered and encouraged members of the crowd to push forward into the Capitol building, *id*.; (5) defendants picked up "plastic handcuffs known as 'zip ties'" inside the Capitol building to carry with them along with the taser, as they chanted "Treason! Treason!", *id*.; (6) defendants breached so deeply inside the Capitol building that defendants entered the gallery inside the U.S. Senate chamber and one defendant discussed stealing the gavel on the Senate dais, *id*.; and (7) defendants expressed to media outlets after the Capitol assault, their willingness to "rise up, band together and fight if necessary," for their political views, *id*. at 1277.  The *Munchel* panel found that because defendants "assaulted no one on January 6," "did not enter the Capitol by force," and "vandalized no property," *id*. at 1283, "the District Court did not adequately demonstrate that it considered whether [defendants] posed an articulable threat to the community in view of their conduct on January 6, and the particular circumstances of January 6," *id*.

### A.      The Nature and Circumstances of the Offense

The first statutory factor requires the Court to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1). To differentiate the severity of the conduct among the hundreds of defendants charged in connection with the events on January 6, the following considerations are helpful: whether defendant (1) "has been charged with felony or misdemeanor offenses;" (2) "engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot;" (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct;" or (6) expressed "words" and made "movements during the riot" that included "breach[ing] the interior of the Capitol building," "injur[ing], attempt[ing] to injure, or threaten[ing] to injury others, or . . . damag[ing] or attempting to damage federal property," "actively threaten[ing] or confront[ing] federal officials or law enforcement" or "otherwise promot[ing] or celebrat[ing] efforts to disrupt the certification of the electoral vote count." *Chrestman*, 2021 U.S. Dist. LEXIS 36117 at *20–24.

At the outset, defendant is charged with four felony offenses, including for offense conduct that involves the use of a dangerous weapon. While the government does not contend that any of these charges give rise to a rebuttable presumption of dangerousness under the BRA, *see* 18 U.S.C. § 3142(e)(2), (f)(1), the crimes alleged are serious and carry severe penalties of up to five years' imprisonment, on Count One, for violation of 18 U.S.C. § 231(a)(3); 20 years' imprisonment, on Count Two, for violation of 18 U.S.C. § 111(a)(1), (b); and ten years' imprisonment, on Counts Three and Four, for violations of 18 U.S.C. §1752(a)(2), (4) and (b)(1)(A), (B). Count Two charges defendant with using a deadly or dangerous weapon, namely his skateboard, to assault, resist, oppose, impede, intimidate, and interfere with, and inflict bodily

injury on, an officer and employee of the United States while that officer was engaged in the

performance of official duties, and is enhanced by defendant's use of his skateboard as a deadly

or dangerous weapon and infliction of bodily injury.  Indictment at 2; *see* 18 U.S.C. § 111(b).[5]

Similarly, Counts Three and Four, which charge defendant with engaging in both disorderly and

disruptive conduct and physical violence on restricted grounds, are enhanced by defendant's use

of the skateboard as a dangerous weapon and the infliction of significant bodily injury.

Indictment at 2–3; *see* 18 U.S.C. § 1752(b).

In reviewing the *Chrestman* factors, beyond defendant's charged conduct, defendant does

not appear to be a member of any organized group that planned for a riot and attack on the

Capitol on January 6, 2021.  To the contrary, the extent of defendant's coordination with other

participants of the riot, either before or after January 6, is limited to his travel with his father and

grandparents, Def.'s Mot., Attach. 3 (letter from Mary and J. Ken Dockery, dated April 20,

2021), and then accompanying his father onto restricted areas on the Capitol grounds and in

efforts to enter the Capitol building.  In addition, defendant does not appear to have come to the

Capitol prepared for conflict, but instead "dressed casually," wearing "no body armor or tactical

gear," Def.'s Mot. at 4, and he brought no conventional dangerous weapon for offensive or

---

[5]     The government's bases for applying § 111(b) enhancement are defendant's use of his skateboard as a "deadly or dangerous weapon" and the alleged "inflict[ion of] bodily injury" to Officer C.B.  Motions Hr'g Tr. at 36:7–36:11 (May 10, 2021) ("May 10, 2021 Hr'g Tr."), ECF No. 22; *see* 18 U.S.C. § 111(b).  The relevant statute does not include a definition for "deadly or dangerous weapon," and the government does not provide one but defendant does not dispute that the skateboard, as allegedly used by defendant, qualifies as a dangerous weapon.  In any event, under the definition of "deadly or dangerous weapon" used by multiple Circuit courts for the purposes of §§ 111—namely, an object either "inherently deadly [or] . . . used in a way that is likely to endanger life or inflict great bodily harm," *United States v. Chansley*, Case No. 21-cr-3 (RCL), 2021 U.S. Dist. LEXIS 43000 at *19–20 (D.D.C. Mar. 8, 2021) (collecting cases); *see also United States v. Arrington*, 309 F.3d 40, 47 n.12 (D.C. Cir. 2002)—defendant's alleged use of his skateboard to hit at least one officer, qualifies the skateboard as capable of "inflict[ing] great bodily harm," and as a dangerous weapon for the purposes of § 111(b).  As for the definition of "bodily injury," the government employs the definition of "serious bodily injury" in 18 U.S.C. § 113(b)(2), which defines the term, by way of § 1365, as "bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty."  18 U.S.C. § 1365(h)(3); *see* May 10, 2021 Hr'g Tr. at 36:19–37:3.

defensive uses, such as a taser, firearm, baton, axe or chemical spray.  He did carry his skateboard, which he says he used "for transport around the City."  *Id*.  Further, the government does not dispute that defendant "made no threats of violence in person or in social media before, during or after the January 6th riot at the Capitol."  *Id*.

The factual proffer by the government to support pretrial detention, as detailed *supra* Part I.A., boils down to the defendant joining the mob on the Capitol grounds and, when a group of MPD officers made its way through the crowd to help secure the Capitol building in response to a call for help from USCP, defendant "smash[ed]" Officer C.B. in the head with his skateboard. Gov't Opp'n at 9.  Defendant then briefly scuffled with Officer C.B., and, when the scuffle was over, defendant yelled disparaging remarks and made obscene gestures at the officers.  After this physical altercation and haranguing of the group of MPD officers, defendant not only remained on the Capitol grounds but, ninety minutes later, made his way to the front of the crowd forcefully trying to enter the Capitol building itself.  Defendant, with his father, attempted to push their way through a line of USCP officers into the Capitol building through the East Rotunda doors.  After being expelled from the building, along with dozens of other rioters, defendant confronted face-to-face MPD officer H.S., who was trying to close the doors to keep the mob out.  Videoclips show defendant raising his skateboard above his head, Gov't's Suppl. at 5 (citing Capitol Footage No. 2 at 1:53), and subsequently bringing it down, *id*. (citing Capitol Footage No. 2 at 1:54), but, as the government concedes, "it remains unclear whether defendant physically strikes the officer," *id*.

Defendant posits that his first physical altercation with an MPD officer, where he hit Officer C.B. with his skateboard, was defensive and unintentional, *see* Def.'s Suppl. at 2–3, explaining "his skateboard became a defensive shield in a split-second encounter with an

unknown force that surprised him," Def.'s Mot. at 1.  While defendant's use of the skateboard to hit MPD Officer C.B. occurred in the midst of a milling crowd and after the officer had initiated physical contact with defendant, defendant's claim of "surprise" that the person he hit with his skateboard was an MPD officer strains credulity.  Def.'s Mot. at 1.  The BWC footage provided shows defendant was facing the long line of MPD officers passing close along his left side and all of these officers were clearly identifiable as MPD officers with clear markings on their uniforms and helmets in defendant's clear view.  P.K. BWC Footage at 13:59:55–14:00:00.  This evidence undermines the defendant's assertion that when he swung his skateboard to the left to hit Officer C.B., somehow he was unaware the target of his blow was a police officer.  *See* Def.'s Reply at 2.

The government also argues that this excuse of "surprise" for his conduct is belied by defendant's subsequent repeat use, less than two hours later, of his skateboard as a weapon against MPD Officer H.S. at the doors to the Capitol.  Gov't's Suppl. at 6-7.  The government reasons that "[a]ny suggestion that defendant somehow mistook the identity of officers dressed in riot gear passing by him on the west lawn, or that he did not have an intent to harm those officers, is undermined by the defendant's nearly-identical violent behavior an hour and a half after his first assault."  *Id*. at 7.  Of course, as defendant points out, MPD Officer H.S. and another officer present at the Capitol doors, after reviewing the videoclips in Capitol Footage Nos. 1 and 2, deny that they were hit with defendant's skateboard or suffered any injury.  Even if no physical contact was made with MPD Officer H.S., the videoclip showing defendant raising his arms with the skateboard in close proximity to a police officer, does have chilling echoes of the incident with MPD Officer C.B. that had occurred shortly before.

Defendant's conduct on January 6—perhaps influenced and encouraged by his own father, who is captured on videotape aggressively engaged with law enforcement to push forward with the crowd to enter the Capitol building—demonstrates that, at least when emboldened by a an angry mob intent on disrupting a lawful democratic and constitutionally-mandated process, defendant will willingly join and follow the crowd to take part in disobeying, provoking and confronting police officers, and, more troubling, engaging in a physical assault on police officers. Taken together, this conduct raises "grave concerns" about defendant's "disregard for the institutions of government and the rule of law." *Chrestman*, 2021 U.S. Dist. LEXIS 36117 at *24. Nevertheless, defendant's conduct is mitigated by other considerations, including the lack of record evidence that he engaged in any preparation, premeditation or coordination for the riot or for violence targeted to harm, disable or disarm police officers that day.

Accordingly, the first factor weighs modestly in favor of detention.

### B.    The Weight of the Evidence Against the Defendant

The weight of the evidence against defendant is strong. Defendant was indisputably present at the U.S. Capitol on January 6, 2021, with his father, as confirmed by flight manifests, reflecting defendant's ticketed travel from San Antonio, Texas to the Washington, D.C. area on January 5, 2021 and return to Texas on January 7, 2021, *see* SOF at 7; Gov't's Opp'n at 11; videoclips from the that day, as described *supra* Part I.A; and physical evidence recovered by law enforcement from defendant's apartment in Florida and from his parents' home in Blanco, Texas, including the red jacket and black and white checkered shirt defendant wore at the Capitol on January 6, *see supra* Part I.C.

As to defendant's conduct underlying the criminal charges against him, four videoclips, including BWC footage from two different officers and security camera footage from inside the Capitol building, show defendant, initially, on the Capitol grounds, where he skirmished

18

physically with MPD officers, hit one MPD officer with his skateboard, and joined the angry crowd in yelling at, and making obscene gestures towards, the MPD officers. Then, less than two hours later, defendant is captured on video pushing with a crowd of other rioters to gain entry to the Capitol building, despite a blockade of USCP and MPD officers valiantly trying to keep the mob out.  Defendant's effort was unsuccessful and he apparently was kept out of the Capitol building.

While not denying that his skateboard hit Officer C.B., defendant disputes the strength of the evidence both as to whether his skateboard hitting Officer C.B. caused any injuries the officer sustained on January 6, 2021, and whether this officer sustained a concussion.  As noted, *supra* Part I.B, the SOF supporting the Criminal Complaint stated that Officer C.B. "sustained a concussion and injury to his right pinky finger," SOF at 3, and this officer, after reviewing his own BWC footage, confirmed that he had been "struck [] in the head with a skateboard" and that he "sustained a concussion and an injury to his right pinky finger" as a result of the assault, Def.'s Suppl., Ex. C, FBI 302 Interview of Officer C.B. (Jan. 19, 2021) at 1, ECF No. 23-3.

Nevertheless, medical records for this officer, at best, are inconclusive as to both issues. While these medical records describe Officer C.B.'s injuries as "blunt force trauma to [his] head, back, hand, and jaw" caused by being "struck [in the head] by bricks, baseball bats, and other hard objects," Medical Records at 14, 16, and a "crushing injury of [the] right little finger" and "[multiple] contusions," *id.* at 3, 6–8, 15, no express reference is made to a skateboard or a confirmed medical diagnosis of a concussion.  The government argues that, considering "unambiguous body worn camera evidence of the defendant's violent assault on Officer C.B.," the records "provide a solid basis for the bodily injury that Officer C.B. suffered."  Gov't's Suppl. at 9.  Certainly, a skateboard qualifies as a "hard object" referenced in the medical

records, but the sheer variety of hard objects used to strike Officer C.B. on January 6 also makes

a causal relationship between this officer's injuries and defendant's skateboard a challenging one

to draw, as defendant contends, *see* Def.'s Suppl. at 5.  Regardless, however of the bodily injury

actually sustained by Officer C.B. directly from the skateboard or whether he sustained a

medically diagnosed concussion, the dangerous risk of such injury when such a hard-edged

object as a skateboard is brought down with force on another person's head and body is real.

The second statutory factor thus favors detention due to defendant's assault on an MPD officer.

### C.    The History and Characteristics of the Defendant

The third factor regarding defendant's history and characteristics favors release.

Defendant is 21 years old, has never been arrested nor has any criminal history, and he self-

reports a minimal history of drinking and marijuana use.  Pretrial Services Report at 1, ECF No.

12; Def.'s Mot. at 8; Gov't's Opp'n at 11.  Moreover, as noted by the Florida magistrate judge,

defendant has extremely strong ties to the Western District of Texas, where he was raised and his

family resides.  Fla. MJ Hr'g Tr. at 24:5–24:9.  The over thirty letters submitted in support of

defendant by family members and friends emphasize defendant's exceptionally close relationship

with his family, church and community.  *See* Def.'s Mot., Attachs. 1, 2, 3, ECF Nos. 13-1, 13-2,

13-3; Def.'s Reply, Attach. 1, ECF No. 15-1.  Although defendant is not employed, he is

enrolled at a college where he will be able to continue his studies virtually if released.  May 10,

2021 Hr'g Tr. at 11:3–11:8.

### D.    The Nature and Seriousness of the Danger Posed by Defendant's Release

The fourth factor, the nature and seriousness of the danger to the community posed by the

defendant's release, favors pretrial release, subject to the combination of conditions suggested by

defendant.  The same considerations that inform analysis of the nature and circumstances of the

charged offenses are probative of dangerousness but, in addition, the court must find, by clear

and convincing evidence, that the defendant "presents an identified and articulable threat to an individual or the community," *Munchel*, 991 F.3d at 1282 (quoting *Salerno*, 481 U.S. at 751), which threat must be "considered in context" regarding "the nature of the threat identified and the resources and capabilities of the defendant," *id.* at 1283.  The D.C. Circuit has indicated that merely showing the danger a person posed to others or the community, or even our democratic institutions, on January 6 is not enough to justify pretrial detention but, now that "the specific circumstances of January 6 have passed," *id.* at 1284, the task is to determine whether the defendant "pose[s] a threat of committing violence in the future," *id*.

Based on the record before the Court, the government has not shown by clear and convincing evidence that defendant poses an ongoing danger to the community outside of the context of January 6, 2021 events at the Capitol.  Defendant has no history of violence before January 6, and a spotless criminal record.  Thus, the only violent or even criminal conduct allegedly committed by defendant occurred while he was caught up in the angry mob on January 6.  While defendant's conduct on January 6 flagrantly ignored signage about restricted areas on the Capitol grounds and police commands to disperse and not enter the Capitol building, joined the mob in provoking and disparaging police officers, and used his skateboard to hit an officer, nothing in the record suggests that he planned for or boasted after about his actions or that he continues to be committed to engaging in the behavior exhibited at the Capitol that posed such "a grave danger to our democracy."  *Munchel*, 991 F.3d 1284.

The government discounts defendant's lack of criminal or violent history, stating that he "ventured down a new and unchartered path [on January 6] making it undeniably clear that he is indeed capable of violent and assaultive behavior." Gov't's Opp'n at 12.  To be sure, this is cause for concern, and warrants addressing by stringent conditions of pretrial release.  At the

same time, limited or lack of criminal history on the part of the *Munchel* defendants was

highlighted by the D.C. Circuit, *see* 991 F.3d at 1275, 1282, to undermine a finding of

dangerousness, even though, unlike the instant defendant, those defendants engaged in planning

for a riot on January 6 and brought with them to the Capitol conventional, dangerous weapons,

including a taser and possibly other weapons stowed in a backpack, made their way deep into the

Capitol building to the Senate gallery while encouraging the mob and boasted of their intent to

continue their efforts to fight even after January 6.  *See supra* n.4.  *Munchel* sets a high threshold

for the requisite finding of future dangerousness for defendants charged for offense conduct

arising out of the January 6 events at the Capitol.

The government urges reliance on a categorical distinction made in a single line in

*Munchel* to find that pretrial detention is warranted here, noting that the Florida magistrate judge

relied on this distinction in order to justify the order of detention.  Gov't's Opp'n at 13 (quoting

Fla. MJ Hr'g Tr. at 27:21–27:22); *see also* Fla. MJ Hr'g Tr. at 27:15–27:23; *id.* at 13:21–14:9.

That single line states: "In our view, those who actually assaulted police officers and broke

through windows, doors, and barricades, and those who aided, conspired with, planned, or

coordinated such actions, are in a different category of dangerousness than those who cheered on

the violence or entered the Capitol after others cleared the way."  *Munchel*, 991 F.3d at 1284.

Indeed, in two unpublished orders after *Munchel*, the D.C. Circuit quoted and relied heavily on

the categorical distinction in *Munchel* to affirm the district court's pretrial detention orders for

defendants charged with criminal conduct arising from the January 6, 2021 events.  *See*

Judgment, *United States v. Sibick*, No. 21-3015 (D.C. Cir. May 21, 2021) (per curiam), Doc. No.

1899654 (affirming pretrial detention of defendant who "participated in an ongoing violent

assault on a police officer at the Capitol on January 6, 2021, ripping off the officer's radio – his

lifeline for help – and his badge."); *United States v. Worrell*, No. 21-3020 (D.C. Cir. May 5, 2021) (per curiam), Doc. No. 1897399 (affirming pretrial detention of defendant who "'actually assaulted police officers' with pepper spray gel" (quoting *Munchel*, 991 F.3d at 1284)).

Since defendant here, too, "actually assaulted" MPD Officer C.B., the government reads *Munchel* as dispositive on the finding of dangerousness.  Not so fast.  The cited *Munchel* line certainly distinguishes between different gradations of dangerous conduct on January 6, but courts retain a "grave constitutional obligation to ensure that the facts and circumstances of each case warrant" the "exceptional treatment" of detention.  *Munchel*, 991 F.3d at 1285.  Thus, defendants are entitled to an individualized determination of dangerousness based on the discrete facts before the court, and such determinations would be defeated by a determination based solely on *Munchel*'s categorical distinction.  As explained succinctly in *United States v. Padilla*, the "[*Munchel*] dichotomy is useful" but is insufficient to "absolve[] this district court of the need to probe the precise nature of defendant's actions—including the type of any force employed—when assessing" a defendant's dangerousness under the § 3142(g) factors.  *United States v. Padilla*, Crim. No. 21-214 (JDB), 2021 U.S. Dist. LEXIS 84859 at *19 n.4 (D.D.C. May 4, 2021).

Here, defendant was certainly in the category of "those who cheered on the violence," and followed the crowd in yelling at police officers, entering restricted areas and even forcefully trying to enter the Capitol building.  He also veered into the even more dangerous category of "those who actually assaulted police officers," but did so without apparent planning or coordinated actions or conventional dangerous weapons and in the midst of a riled up, angry mob.  In this way, "the presence of the group was critical" to defendant's ability to assault a police officer,  *Munchel*, 991 F.3d at 1284, and outside those "specific circumstances that made

it possible on January 6," *id.*, for defendant to engage in such an assault, the likelihood of future violence to the community or to other law enforcement officers, appears small, particularly given his lack of any criminal or violent history and the release conditions to be imposed.

This assessment of defendant's dangerousness is consistent with the government's determination in three cases highlighted by defendant. *See* Def.'s Mot. at 4–5.[6]  In *United States v. Gossjankowski*, 21-cr-123-PLF, *United States v. Blair*, 21-cr-186-CRC, and *United States v. Leffingwell*, 21-cr-005-ABJ, the defendants, like defendant in this case, were charged with offense conduct violative of 18 U.S.C. § 111(b), on January 6, 2021, by physically assaulting police officers with a taser, lacrosse stick and fists, respectively, but were released pretrial without government opposition.  *See* Crim. Compl., Statement of Facts at 2, *United States v. Gossjankowski*, Case No. 21-cr-123-PLF (D.D.C. Jan. 18, 2021), ECF No. 1-1; Crim. Compl., Statement of Facts at 3–4, *United States v. Blair*, Case No. 21-cr-186-CRC (D.D.C. Feb. 9, 2021), ECF No. 1-1;  Crim. Compl., Statement of Facts at 1, *United States v. Leffingwell*, Case No. 21-cr-5-ABJ (D.D.C. Jan. 7, 2021), ECF No. 1-1.  None of these three defendants were part of any organized gang, had engaged in any prior planning or coordination with others for their participation on January 6, nor had any discernible criminal or violent history.  In other words, as with the instant defendant, the dangerousness of these three defendants appeared to be limited to their conduct on January 6.

Although the government counters that the government's pretrial detention positions in these three cases are attributable to early efforts immediately following January 6, when the

---

[6]     The *Munchel* panel acknowledged that "[w]hatever potential persuasiveness the government's failure to seek detention in another case carries in the abstract, every such decision by the government is highly dependent on the specific facts and circumstances of each case," 991 F.3d at 1284, but nonetheless directed that the district court "should" consider comparator cases in weighing the government's proffer of dangerousness if defendants "raise the issue upon remand," *id*.

government "was trying to determine how to begin and calibrate the prosecutions of hundreds of individuals who violated the law" that day,  Gov't's Suppl. at 11, this argument is hard to square with the government's continued agreement to pretrial release even after these three defendants were indicted.  *See* Indictment, *United States v. Gossjankowski*, 21-cr-123-PLF (D.D.C. Feb. 17, 2021), ECF No. 10; Indictment, *United States v. Blair*, 21-cr-186-CRC (D.D.C. Mar. 5, 2021), ECF No. 8; Indictment, *United States v. Leffingwell*, 21-cr-5-ABJ (D.D.C. Jan. 11, 2021), ECF No. 6.  The government also distinguishes these cases for lack of a causal connection between the defendants' offense conduct and any officer injury, pointing out that, in *Gossjankowski*, there was "no indication that officers suffered any injuries related to the use of the taser," Gov't's Suppl. at 11; in *Blair*, the offense conduct did not result in officer injury, *id*. at 12; and, in *Leffingwell,* the defendant "is not currently charged with a crime of violence" and there remains "no allegation that he used a dangerous weapon or that he inflicted bodily injury," *id*.  Given the inconclusive medical records for Officer C.B., whether defendant's skateboard caused this officer's injury seems similarly attenuated.

In any event, the measure of dangerousness is broader than whether a police officer suffered actual injury.  Conduct on January 6, 2021, showing a defendant's intentionality for engaging in assaultive behavior, as evidenced by planning for, carrying and using a conventional dangerous weapon, like a taser or chemical spray, raises a much greater risk of dangerousness than bringing a skateboard.  Intentional and purposeful assaultive conduct, particularly involving multiple incidents of directly provocative and aggressive, threatening actions toward police, particularly combined with verbal threats before, during or continuing after that date, are all indicia of dangerousness that may warrant pretrial detention.  *See, e.g., Padilla*, 2021 U.S. Dist. LEXIS 84859 at *4–5 (granting government's motion for pretrial detention where defendant, on

January 6, 2021, approached police line threatening officers, encouraged the crowd to push against the line with him, threw a pole directly "at a mass of officers" three hours later such that the pole "hit an officer," and expressed, both before and after that date, the intention to fight with reference to weapons); *United States v. Fairlamb*, Case No. 21-cr-120-RCL, 2021 U.S. Dist. LEXIS 78963 at *1–5 (D.D.C. Apr. 26, 2021) (granting government's motion for pretrial detention where defendant, on January 6, 2021, climbed up scaffolding to rile up the crowd and declare "We ain't fucking leavin'!" before entering the Capitol building with a discarded police baton, shouting at law enforcement, and shoving and punching an officer); *United States v. Sabol*, Crim. Action No. 21-35-1 (EGS), 2021 U.S. Dist. LEXIS 71836 at *2–6 (D.D.C. Apr. 14, 2021) (denying defendant's motion for pretrial release where defendant, on January 6, 2021, charged an officer, "yanked" a baton out of the officer's hand with such force that he knocked the officer down the stairs, held the baton against another officer's neck and then helped pull the officer "face-first down the steps and into the mob"). By contrast, the evidence presented here shows that defendant struck a law enforcement officer with his skateboard, joined a mob chorus in haranguing a police line and joined the mob in trying, along his father, to force his way into the Capitol building. This falls short of demonstrating that defendant poses the kind of dangerousness requiring pretrial detention since the risk he poses to the safety of the community and others may be cabined by tailored release conditions.

Accordingly, this last factor weighs against pretrial detention.

***

Consideration of all of the factors under § 3142(g), and the specific guidance of *Munchel*, persuades this Court that, though defendant's conduct in hitting an MPD officer with his skateboard, combined with his other conduct on January 6, 2021 at the Capitol, was dangerous

26

then, the future risk he poses to the safety of others and the community can be contained with stringent conditions of release.

**IV.     CONCLUSION**

Upon consideration of the Criminal Complaint, the Indictment, defendant's Motion for Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b), and the initial and supplemental memoranda in support and opposition thereto, the evidence proffered by both parties, including at the detention hearing held on May 10, 2021, and the entire record herein, the Court finds that the government has failed to meet its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions will reasonably ensure the safety of any other person or the community were defendant released pending trial.  18 U.S.C. § 3142(e)(1), (f)(2). Accordingly, defendant's Motion for Revocation of the Detention Order Pursuant to 18 U.S.C. § 3145(b) is granted and defendant shall be released pending a final disposition in this case, under the conditions set out fully in the Order entered contemporaneously with this Memorandum Opinion.

Date:  May 28, 2021

_____
BERYL A. HOWELL
Chief Judge